IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**ATLANTIC BULK CARRIER**
**CORPORATION,**

         **Plaintiff,**

v.                                                                           **Civil Action No. 3:19cv318**

**AIG SPECIALTY INSURANCE, CO.,**

         **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on two motions:

(1)     Defendant AIG Specialty Insurance Co.'s ("AIG") Motion to Dismiss (the "Motion to Dismiss"), (ECF No. 7); and,

(2)     Plaintiff Atlantic Bulk Carrier Corporation's ("Atlantic") Request for Oral Hearing (the "Motion for Hearing"), (ECF No. 14).

Atlantic responded to the Motion to Dismiss, (ECF No. 9), and AIG replied, (ECF No. 10). AIG did not respond to the Motion for Hearing and the time to do so has expired. These matters are ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process.[1] The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).[2] For the reasons that follow, the Court will grant the Motion to Dismiss.

---

[1] In the Motion for Hearing, Atlantic "requests an oral hearing prior to [the Court] determining and ruling" on the Motion to Dismiss. (Mot. Hearing 1, ECF No. 14.) Because the Court does not require oral argument to decide the Motion to Dismiss, the Court will deny the Motion for Hearing.

[2] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a)(1). Atlantic is a citizen of

## I. Factual and Procedural Background

### A. Factual Background[3]

Atlantic brings this insurance coverage dispute against its insurer, AIG, seeking a declaratory judgment that AIG has a duty to defend and a duty to indemnify Atlantic under a Contractors Pollution Liability Policy for a third party claim brought against Atlantic. The Court begins by introducing the third party claim for which Atlantic seeks coverage. Only then will the Court introduce the pertinent policy language.

#### 1. The Third Party Claim

Using tank trailers, Atlantic "haul[s] both liquid and dry materials along the East Coast." (Compl. ¶ 2, ECF No. 1.) "On or about August 13, 2018, [Atlantic] loaded plastic chip-like material into one of its tank[] trailers for one of its customers." (*Id.* ¶ 5.) "That same day, [Atlantic] proceeded to deliver the material to the consignee." (*Id.* ¶ 6.) After delivering the "plastic chip-like material," Atlantic "had the tank[]trailer cleaned by a truck wash facility." (*Id.* ¶¶ 5, 7.) Atlantic asserts that the truck wash facility did not properly clean the tank[]trailer "leaving undisclosed amounts of the chip-like material in it." (*Id.* ¶ 7.)

The next day, August 14, 2018, Atlantic "contracted with Speedway Packaging & Distribution Co., Inc. ('Speedway') for transloading service where plastic pellets were transferred from a rail car to the subject tank[]trailer." (*Id.* ¶ 8.) "The plastic pellets mixed with

---

Virginia, AIG is a citizen of Illinois and New York, and the Complaint alleges damages exceeding $75,000.

[3] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). For the purpose of the Rule 12(b)(6) Motion to Dismiss, "a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2011)).

the residual plastic[] chip-like material thereby contaminating the plastic pellets." (*Id.*) Atlantic describes the mixture of the plastic chip-like material with the plastic pellets as the "Contaminated Material." (*Id.*)

Atlantic delivered the plastic pellets, which had mixed with the plastic chip-like material—at that point the Contaminated Material—to Speedway's facility, "where Speedway proceeded to repackage the [plastic pellets and plastic chip-like material] into boxes for sale to its customer, Sealed Air Corporation ('Sealed Air')." (*Id.* ¶ 9.)

"Sealed Air then used the [Contaminated Material] in its operations . . . for processing into plastic films and wraps." (*Id.* ¶ 10.) "As a direct result of the [Contaminated Material], Sealed Air alleges it has been damaged in the amount of $129,605.49, which includes production of un[]saleable product, defective material, transportation and storage costs, and significant down time and ancillary costs associated." (*Id.* ¶ 11.) "Sealed Air has demanded that [Atlantic] reimburse it for these losses." (*Id.*) Sealed Air's demand to Atlantic is the third party claim at issue.

### 2. The Applicable Policy Language

AIG "issued the [C]ontractor's [P]ollution [L]iability insurance policy to [Atlantic] with policy number CPO13089050 for the policy period April 1, 2018 to April 1, 2019 (the 'Policy')." (*Id.* ¶ 12.) The Policy lists Atlantic as the named insurance. (*Id.* ¶ 13; Compl. Ex. A "Policy" 5,[4] ECF No. 1-4.)

As to coverage, the Policy provides, in pertinent part:

> The Company will pay on behalf of the **Insured** all sums that the **Insured** shall become legally obligated to pay as **Loss** as a result of **Claims** for **Bodily Injury, Property Damage** or **Environmental Damage** resulting from **Pollution Conditions** caused by **Covered Operations**. The **Pollution Conditions** must be

---

[4] The indicated page number references the page number as assigned by the Court's CM/ECF System.

unexpected and unintended from the standpoint of the **Insured**. The **Bodily Injury, Property Damage** or **Environmental Damage** must occur during the **Policy Period.**

(Policy 6 (emphasis in original).)

The Policy defines a number of terms. It provides definitions for the following four terms, which will meaningfully affect the Court's analysis: (1) claim; (2) property damage; (3) pollution conditions; and, (4) loss. The Policy provides the following definitions for these terms.

1. **Claim:** "[A] written demand received by an **Insured** seeking a remedy and alleging liability or responsibility on the part of the **Named Insured** for **Bodily Injury, Property Damage** or **Environmental Damage**." (Policy 15.)

2. **Property Damage:** (1) "Physical injury to or destruction of tangible property of parties other than the **Insured** including the resulting loss of use and diminution in value thereof;" (2) "Loss of use, but not diminution in value, of tangible property of parties other than the **Insured** that has not been physically injured or destroyed . . ." (Policy 18.) The Policy specifies that "**Property Damage** does not include **Environmental Damage**." (*Id.*)

3. **Pollution Conditions:** "[T]he discharge, dispersal, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, medical waste and waste materials into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, provided such conditions are not naturally present in the environment in the concentration or amounts discovered, unless such natural condition(s) are released or dispersed as a result of the performance of **Covered Operations**, and such release or dispersal is unexpected and unintended from the standpoint of the **Insured**." (*Id.*)

4. **Loss:** Includes "[w]ith respect to **Claims** for **Bodily Injury** or **Property Damage:** (a) Monetary awards or settlements of compensatory damages; (b) where allowable by law, punitive, exemplary, or multiple damages; and (c) civil fines, penalties, or assessments." (*Id.* 17.)

### 3. Atlantic's Request for Coverage

After Sealed Air demanded that Atlantic cover its $129,605.49 in damages, Atlantic demanded coverage from AIG under the Policy. (Compl. ¶ 29.) AIG informed Atlantic that "there is no coverage under the [P]olicy" and declined coverage. (*Id.* ¶ 30.)

### B. Procedural History

Following AIG's denial of coverage, Atlantic filed its Complaint seeking a declaratory judgment that AIG has a duty to defend and a duty to indemnify Atlantic against the third party claim brought by Sealed Air. AIG then filed the instant Motion to Dismiss. Atlantic responded and AIG replied.

## II. Standard of Review: Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. The Court must assume all well pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 678–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### III. Analysis

A. <u>**Insurance Contract Interpretation Under Virginia Law**</u>

As with other contracts, under Virginia law[5] the Court will interpret an insurance policy "in accordance with the intention of the parties gleaned from the words they have used in the document. Each phrase and clause of an insurance contract 'should be considered and construed

---

[5] The parties agree that the Court must analyze the Policy pursuant to Virginia contract law. *See Klein v. Verizon Commc'ns, Inc.*, 674 Fed. App'x 304, 307–08 (4th Cir. 2017) (finding that a federal court sitting in diversity must apply the choice of law provisions of the state in which it sits, and that under Virginia law "lex loci contractus [or the law of the place of the contract] serves as the default rule"); *Buchanan v. Doe*, 246 Va. 67, 70–71 (1993) (finding that under Virginia state law, "the law of the place where an insurance contract is written and delivered controls issues as to its coverage"). Although Atlantic does not say that it signed the contract for the Policy in Virginia, because Atlantic has its principal place of business in Virginia, the Court reasonably infers that Atlantic signed the contract in Virginia. (*See* Compl. ¶ 2.) Certainly AIG does not dispute application of Virginia law.

together and seemingly conflicting provisions harmonized when that can be reasonably done.'" *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012) (quoting *Floyd v. Northern Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993)). "It is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *Id.* (quoting *Barber v. VistaRMS, Inc.*, 634 S.E.2d 706, 712 (Va. 2006)). "Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *Id.* (quoting *City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.*, 628 S.E.2d 539, 541 (Va. 2006)).

Where a term is undefined in the contract "'general rules of contract interpretation, and specifically insurance contract interpretation, require' that the term 'be given its plain and ordinary meaning.'" *Travelers Indem. Co. of Am. v. Portal Healthcare Sols., LLC*, 35 F. Supp. 3d 765, 770 (E.D. Va. 2014) (quoting *Solers, Inc. v. Hartford Cas. Ins. Co.*, 146 F. Supp. 2d 785, 792 (E.D. Va. 2001)). "Virginia courts customarily turn to dictionaries for help in deciphering a term's plain meaning." *Id.* (citing cases).

"[T]he insured bears . . . [the] burden to establish a *prima facie* case that coverage should be triggered. In other words, the burden is on the policyholder at the outset to bring himself within the terms of the policy." *Capitol Prop. Mgmt. Corp. v. Nationwide Prop. & Cas. Ins. Co.*, 261 F. Supp. 3d 680, 689–90 (E.D. Va. 2017). "Virginia has long followed the rule that if the insured fails to fulfill a condition of an insurance policy, the insurer's coverage obligation is not triggered." *Bryan Bros. Inc. v. Cont'l Cas. Co.*, 660 F.3d 827, 830 (4th Cir. 2011) (citations omitted).

Under Virginia law, "an insurance policy is not ambiguous merely because courts of varying jurisdictions differ with respect to the construction of policy language." *TravCo Ins. Co.*, 736 S.E.2d at 325 (quoting *PBM Nutritionals, LLC*, 724 S.E.2d at 713). When the terms of the policy are clear, a court need not look to decisions from other jurisdictions to interpret the policy. *See id.* at 324.

### B. Because the Third Party Claim Does Not Fall Within the Plain Language of the Policy, the Court Will Grant the Motion to Dismiss

Here, an application of the plain language of the Policy resolves the instant Motion to Dismiss, therefore, the Court need not turn to the out of jurisdiction case law cited by the Parties. The Court will, however, provide case citations where they provide helpful context. The Court begins by defining the event for which Atlantic seeks coverage and then turns to the applicable language of the Policy. Finally, the Court will discuss why the plain language of the Policy precludes coverage.

#### 1. Atlantic Seeks Coverage for the Mixing of the Plastic Chip-Like Material With the Plastic Pellets that Occurred in the Tank Trailer

To obtain coverage under the Policy, Atlantic must show that its loss resulted from a Pollution Condition, as that term is defined in the Policy. (*See* Policy 6 (defining coverage).) When deciding the Motion to Dismiss, the Court accepts as true "all of the factual allegations contained in the complaint and draw[s] all reasonable inferences in favor of" Atlantic. *Kensington*, 684 F.3d at 467 (internal quotation marks omitted). Even under that standard of review, because the contamination for which Atlantic seeks coverage occurred when the plastic chip-like material mixed with the plastic pellets, when and where that occurred must meet the Policy's definition of Pollution Condition.

Much of the Parties' briefing focuses on whether a "discharge, dispersal, release or escape" occurred such that the Policy's definition of Pollution Condition applies. (*See* Policy 18.) AIG argues that because the tank trailer already contained the plastic chip-like material (it having been deliberately placed in the tank trailer to be transported to Atlantic's customer and later left there by the truck washing facility) when the plastic pellets were added to the tank trailer, no "discharge, dispersal, release or escape" occurred. (*See id.*) Atlantic, on the other hand, identifies four events—which each represent some form of discharge or dispersal—that may individually satisfy the definition of Pollution Condition. These events include: (1) when the plastic chip-like material "became comingled with the [plastic pellets] on the tank[]trailer," (Resp. Mot Dismiss 5); (2) when Atlantic unloaded the mixture of the plastic chip-like material and the plastic pellets at Speedway's facility, (*id.* 6); (3) when Speedway packaged the mixture of the plastic chip-like material and the plastic pellets into boxes for Sealed Air, (*id.*); and, (4) when Sealed Air "processed into plastic films and wraps" the mixture of the plastic chip-like material and plastic pellets, (*id.*).

Because the first event—the mixing of the plastic pellets with the plastic chip-like material in the tank trailer—gives rise to the harm suffered by Sealed Air, that event forms the basis of coverage under the Policy. The Policy's language confirms this.

The Court begins by looking to the plain language of the Policy. *See TravCo Ins. Co.*, 736 S.E.2d at 325. Here, the Policy defines Loss "[w]ith respect to **Claims** for **Bodily Injury** or **Property Damage**" as "(a) Monetary awards or settlements of compensatory damages; (b) where allowable by law, punitive, exemplary, or multiple damages; and (c) civil fines, penalties, or assessments." (Policy 17 (emphasis in original).) Atlantic does not seek coverage for a bodily injury, but instead for property damage suffered by Sealed Air, as alleged in Sealed

Air's third party claim. The Policy defines Property Damage, in pertinent part, as: (1) "Physical injury to or destruction of tangible property of parties other than the **Insured** including the resulting loss of use and diminution in value thereof;" (2) "Loss of use, but not diminution in value, of tangible property of parties other than the **Insured** that has not been physically injured or destroyed . . ." (*Id.* 18 (emphasis in original).)

As alleged in the Complaint, Sealed Air seeks damages for "production of un[]saleable product, defective material, transportation and storage costs, and significant down time and ancillary costs." (Compl. ¶ 11.) Here, the intermingling of the plastic chip-like material with the plastic pellets caused Sealed Air's damages. Atlantic does not allege that any other or additional contamination occurred when it transferred the mixture of the plastic chip-like materials and plastic pellets to Speedway. It also does not argue that any contamination occurred when Speedway subsequently packed the mixture into boxes for transportation to Sealed Air. Similarly, it states that Sealed Air simply used the mixture "in its operations at its facility . . . for processing into plastic films and wraps." (Compl. ¶ 10.) Because the contamination that gave rise to the Loss for which Atlantic seeks coverage occurred when the plastic chip-like material mixed with the plastic pellets in the tank trailer, in this particular case this event must satisfy the definition of Pollution Condition in the Policy. *See TravCo Ins. Co.*, 736 S.E.2d at 325 (stating that "[i]t is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning.").

### 2. The Plain Language of the Policy

Having determined that the mixing of the plastic chip-like material with the plastic pellets must fall within the Policy's coverage, the Court now turns to the language of the Policy. Here, the Parties have cited cases from a number of other jurisdictions in support of their positions as

to whether coverage exists under the Policy. Because the language of the Policy is clear, the Court need not turn to this case law. *See TravCo Ins. Co.*, 736 S.E.2d at 324 (stating that when the terms of the policy are clear, a court need not look to decisions from other jurisdictions to interpret the policy). Where appropriate, though, the Court will provide a citation to caselaw that provides helpful context.

In defining coverage under the Policy, the Policy provides:

> [t]he Company will pay on behalf of the **Insured**[6] all sums that the **Insured** shall become legally obligated to pay as **Loss** as a result of **Claims** for **Bodily Injury, Property Damage** or **Environmental Damage** resulting from **Pollution Conditions** caused by **Covered Operations**. The **Pollution Conditions** must be unexpected and unintended from the standpoint of the **Insured**.[7] The **Bodily Injury, Property Damage** or **Environmental Damage** must occur during the **Policy Period**.[8]

(Policy 6.) Importantly, the Policy defines Pollution Conditions as:

> [T]he *discharge, dispersal, release* or *escape* of any solid, liquid, gaseous or thermal irritant or contaminant,[9] including smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, medical waste and waste materials into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, provided such conditions are not naturally present in the environment in the concentration or amounts discovered, unless such natural condition(s) are released or dispersed as a result of the performance of **Covered Operations**, and such release or dispersal is unexpected and unintended from the standpoint of the **Insured**.

(*Id.* 18.)

---

[6] AIG does not dispute that Atlantic is an Insured under the Policy.

[7] AIG does not dispute that the mixture of the plastic chip-like material and the plastic pellets was "unexpected and unintended" by Atlantic. (Policy 6.)

[8] AIG does not dispute that the mixture of the plastic chip-like material and the plastic pellets occurred during the applicable Policy Period.

[9] In its Response to the Motion to Dismiss, Atlantic argues that the plastic chip-like material left in the tank trailer is a contaminant as that term is used in the Policy. (*See* Resp. Mot. Dismiss 4–5.) AIG does not dispute this. (Reply Mot. Dismiss 1 (stating that "Atlantic spends much effort in its Opposition arguing that the plastic chips at issue are a 'contaminant' or pollutant—a point not disputed here.").)

11

Under Virginia law, the Court begins with the plain language of the Policy. *See TravCo Ins. Co.*, 736 S.E.2d at 325. The Court will interpret an insurance policy "in accordance with the intention of the parties gleaned from the words they have used in the document." *Id.* It will also consider and construe "[e]ach phrase and clause of an insurance contract . . . together" and attempt to harmonize "seemingly conflicting provisions . . . when that can be reasonably done." *Id.* Where a term is undefined in the contract "'general rules of contract interpretation, and specifically insurance contract interpretation, require' that the term 'be given its plain and ordinary meaning.'" *Travelers Indem. Co. of Am.*, 35 F. Supp. 3d at 770 (quoting *Solers, Inc.*, 146 F. Supp. 2d at 792). "Virginia courts customarily turn to dictionaries for help in deciphering a term's plain meaning." *Id.* (citing cases).

Although the Policy does not define the terms "discharge, dispersal, release or escape," (*see* Policy 18), looking to the Merriam-Webster's Diction definition of these terms, the plain and ordinary meaning clearly requires some type of movement. *See Travelers Indem. Co. of Am.*, 35 F. Supp. 3d at 770 (stating that "Virginia courts customarily turn to dictionaries for help in deciphering a term's plain meaning"). For instance, discharge is defined as "to relieve of a charge, load, or burden." *Discharge*, Merriam-Webster's Dictionary. Similarly, dispersal means "the act or result of dispersing," *dispersal*, Merriam-Webster's Dictionary, which in turn means "to cause to become spread widely," *disperse*, Merriam-Webster's Dictionary. The definition of release, "to set free from restraint, confinement, or servitude," also envisions some type of movement. *Release*, Merriam-Webster's Dictionary. Finally, Merriam-Webster's Dictionary defines escape as "to get away" or "to issue from confinement." *Escape*, Merriam-Webster's Dictionary.

Clearly, the plain meaning of the terms "discharge, dispersal, release or escape" each envision some type of movement. This conclusion comports with a prior decision from a sister court in this district. *See Fireman's Ins. Co. of Wash., D.C. v. Kline & Son Cement Repair, Inc.*, 474 F. Supp. 2d 779, 798 (E.D. Va. 2007) (stating that "common to all of" the words discharge, dispersal, seepage, migration, release, or escape contained in a similarly worded *exclusion* in a commercial general liability insurance "is, obviously, the element of movement").[10]

In the context of the definition of Pollution Condition contained in the Policy at issue here, that movement must be from where the contaminant is held "into or upon land or any structure on land, the atmosphere or any watercourse or body of water." (*See* Policy 18.) The Court must now determine whether the mixing of the plastic chip-like material with the plastic pellets in the tank trailer satisfied the Policy's definition of Pollution Condition.

### 3. The Mixing of the Plastic Chip-Like Material with the Plastic Pellets Does Not Fall Within the Definition of Pollution Condition

The Court has decided that Atlantic's request for coverage arises out of the mixing of the plastic chip-like material with the plastic pellets that occurred in the tank trailer. It has also decided that the plain meaning of the definition of Pollution Condition requires movement. The Court must now determine whether the mixing of the two substances that took place in the tank trailer falls within the purview of the definition of Pollution Condition. It does not. However, even if the comingling of the plastic chip-like material mixed with the plastic pellets did fulfill

---

[10] Atlantic cites to *Fireman's Insurance* to support its contention that "this court refused to constrain the definition of pollution to 'unexpected/unintended discharges, release, etc., of pollutants into the environment,' and instead, explicitly recognized that pollution may occur 'in the normal course of business.'" (Resp. Mot. Dismiss 8 (quoting *Fireman's Ins.*, 474 F. Supp. 2d at 799).) *Fireman's Insurance* does not provide the support that Atlantic seeks. The *Fireman's Insurance* court interpreted a policy *exclusion* contained in a commercial general liability insurance policy. *See Fireman's Ins.*, 474 F. Supp. 2d at 788. Unlike *Fireman's Insurance,* here, the Court must determine whether coverage exists under a Contractor's Pollution Liability Policy, not whether an exclusion precludes coverage.

the required movement, because that comingling occurred when the plastic pellets mixed with the plastic chip-like material while in the tank trailer, it did not occur on the "land, or any structure on land, the atmosphere or any watercourse or body of water," meaning that coverage still would not exist. (Policy 18.) The Court will address each conclusion in turn.

### a. Because the Tank Trailer Contained the Plastic Chip-Like Material, the Court Will Grant the Motion to Dismiss

Virginia law requires Atlantic, as the insured, to "establish a *prima facie* case that coverage should be triggered. In other words, the burden is on the policyholder at the outset to bring himself [or herself] within the terms of the policy." *Capitol Prop. Mgmt. Corp.*, 261 F. Supp. 3d at 689–90. Here, even assuming the truth of all well pleaded factual allegations in the Complaint and making all inferences in favor of Atlantic, Atlantic has failed to carry that burden.

Atlantic states that it "loaded plastic chip-like material into one of its tank[]trailers for one its customers." (Compl. ¶ 5.) "That same day, [Atlantic] proceeded to deliver the material to the consignee." (*Id.* ¶ 6.) Atlantic "then had the tank[]trailer cleaned by a truck wash facility." (*Id.* ¶ 7.) The truck wash facility, however, did not properly wash the tank trailer and left "undisclosed amounts of the chip-like material in it." (*Id.*) When the plastic pellets were later placed in the tank trailer, "[t]he plastic pellets mixed with the residual plastic[] chip-like material thereby contaminating the plastic pellets." (*Id.* ¶ 8.)

In this sequence of events, the contamination occurred when the plastic pellets combined with the plastic chip-like material while in the tank trailer. The plastic chip-like material did not move from the tank trailer into which Atlantic deliberately placed it before contaminating the plastic pellets. The Pollution Condition requires the contaminate to have engaged in some type of movement. Because the plastic chip-like material did not move from the place where Atlantic deliberately placed it before it contaminated the plastic pellets, the mixing of the plastic chip-like

14

material with the plastic pellets that occurred in the tank trailer does not fall within the purview of the Pollution Condition definition. *See Colonial Oil Indus., Inc. v. Indian Harbor Ins. Co.*, No. 11 Civ. 5018, 2012 WL 3964747, at *4 (S.D.N.Y. Sept. 10, 2012) (stating that a similarly worded Pollution and Remediating Legal Liability Insurance Policy did not provide coverage when "the pollutant remains contained in vessels where it is intended to be kept and which were created for the very purpose of holding the pollutant until it is intentionally removed into a different container").[11]

The Policy requires Atlantic's loss to result from a Pollution Condition. Because the contamination occurred when the plastic chip-like material combined with the plastic pellets, and that event does not satisfy the definition of Pollution Condition, Atlantic has failed to show a *prima facie* case that the Policy provides coverage. *See Capitol Prop. Mgmt. Corp.*, 261 F. Supp. 3d at 689–90. Therefore, the Court will grant the Motion to Dismiss.

### b. Even if the Mixing of the Plastic Chip-Like Material With the Plastic Pellets Did Fulfill the Requirements of the Pollution Condition, the Court Would Grant the Motion to Dismiss

Atlantic attempts to salvage its claim saying that the dispersal of the plastic chip-like material through the plastic pellets satisfies the Policy's definition of Pollution Condition. Even if the Court construed this movement to fulfill the movement required by the definition of Pollution Condition, the Court would likely grant the Motion to Dismiss because this dispersal did not occur "into or upon land, or any structure on land, the atmosphere or any watercourse or body of water." (Policy 18.)

---

[11] Because the plain language of the Policy does not provide coverage for Atlantic based on Sealed Air's third party claim, the Court need not rely on case law from other jurisdictions. *See TravCo Ins. Co.*, 736 S.E.2d at 324. Although the Court need not rely on *Colonial Oil* to reach its conclusions, this case provides a helpful example of a factually analogous situation in which an entity sought coverage under a policy—similar to this one—and which also contained coverage for structures upon land. *See generally Colonial Oil*, 2012 WL 3964747.

Under Virginia law, the Court must consider and construe "[e]ach phrase and clause of an insurance contract." *TravCo Ins. Co.*, 736 S.E.2d at 325. The Pollution Condition requires not only movement through the "discharge, dispersal, release or escape of . . . [a] contaminant," but that movement must be "into or upon land, or any structure on land, the atmosphere or any watercourse or body of water." (Policy 18.)

Even if the Court presumed that the mixing of the plastic chip-like material with the plastic pellets fulfilled the movement required by the first piece of the Pollution Condition definition, Atlantic still must fulfill the second aspect of that definition. *See Capitol Prop. Mgmt. Corp*, 261 F. Supp. 3d at 689–90 (stating that "the insured bears . . . [the] burden to establish a *prima facie* case that coverage should be triggered"). Here, Atlantic's allegations establish only that the plastic chip-like material mixed with the plastic pellets in the tank trailer. The plastic pellets likely are not "land, or any structure on land, the atmosphere or any watercourse or body of water." (Policy 18.) Similarly, a mobile transportation vehicle, such as a tank trailer, is likely not a "structure on land." Therefore, the mixing of the plastic chip-like material with the plastic pellets likely fails to satisfy the Policy's plain language as to where the contamination must occur.[12]

---

[12] The Parties cite various out-of-circuit cases to show that a disagreement exists among other courts regarding whether pollution *exclusions* apply only to conditions that involve traditional environmental pollution or other occurrences that may be read to fall within these pollution *exclusions*. *See, e.g., MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 641–42 (2003) (stating that roughly two camps exist interpreting these pollution exclusions "[o]ne camp maintains that the exclusion applies only to traditional environmental pollution into the air, water, and soil, but generally not to all injuries involving the negligent use or handling of toxic substances that occur in the normal course of business" and the other "maintains that the clause applies equally to negligence involving toxic substances and traditional environmental pollution"); *Judd Ranch, Inc. v. Glaser Trucking Serv., Inc.*, No. 06-1245, 2007 WL 1520905, at *7 (D. Kans. May 22, 2007) (concluding that a pollution exclusion applied when scrap metal contaminated cattle feed while in a trailer). However, these cases evaluate insurance policy *exclusions*. These cases also provide little support because none of these policy *exclusions* contain the "structure on land" language included in the Pollution Condition.

Therefore, even if the Court presumed that Atlantic met the first part of the Pollution Condition—the required movement—by showing that the plastic chip-like material moved throughout the plastic pellets, because it cannot meet the second part of the definition—the place of the movement—the Court would likely conclude that Atlantic has failed to meet its burden in showing a *prima facie* case of coverage under the Policy. For this reason, the Court would likely grant the Motion to Dismiss.[13]

### IV. Conclusion

For the foregoing reasons, Atlantic has failed to show a *prima facie* case of coverage under the Policy. Therefore, the Court will grant the Motion to Dismiss and will deny the Motion for Hearing.

An appropriate order shall issue.

/s/
M. Hannah Lauck
United States District Judge

Date: 3/25/2020
Richmond, Virginia

---

Here, the Court faces a Contractor's Pollution Liability Policy itself, not a policy exclusion. The Pollution Condition contains an additional location where the contamination may occur, namely a "structure on land." Because these cases address policy exclusions and contain different policy language, the Court need not decide which side of the disagreement regarding the proper interpretation of policy exclusions to follow. The plain language of the Policy at issue here compels the outcome of the Motion to Dismiss. *C.f. TravCo Ins. Co.*, 736 S.E.2d at 325 (stating that under Virginia law, "an insurance policy is not ambiguous merely because courts of varying jurisdictions differ with respect to the construction of policy language.")

[13] Atlantic relies on the United States District Court for the District of Kansas's decision in *Judd Ranch*, 2007 WL 1520905, to argue that coverage exists under the Policy. Although the District of Kansas faced a factually similar situation (in *Judd Ranch* scrap metal pieces left behind in a trailer mixed with cattle feed pellets), the *Judd Ranch* court considered a different type of insurance policy. *See id.* at *2. First, the *Judd Ranch* court considered whether the situation fell within a policy *exclusion*. *Id.*; (Policy 18). Second, the policy exclusion in *Judd Ranch* did not contain a limitation that the pollution be moved "into or upon land, or any structure upon on land, the atmosphere or any watercourse or body of water." *Id.* Therefore, even if the Court were to consider case law from other jurisdictions, *Judd Ranch* provides little persuasive value.